[Civ. No. 6205. Third Appellate District.—October 31, 1939.]

JOHN V. HOUSE et al., Respondents, v. PACIFIC GREY-HOUND LINES (a Corporation), Appellant.

Carter, Barrett, Finley & Carlton for Appellant.

L. C. Smith and Alfred E. Frazier for Respondents.

PULLEN, P. J.—In this action by plaintiffs, husband and wife, against the Pacific Greyhound Lines, a common carrier,

for the alleged wrongful death of their son, Carl James House, it is alleged that Carl James House, a young man eighteen years of age, lost his life while a fare-paying passenger on a bus of the Greyhound Lines through its negligence, and that plaintiffs have been damaged thereby. By an amended answer defendant denied the identity of the deceased, the damages sustained and that as to Samie G. House the complaint failed to state a cause of action, and that the court had no jurisdiction of the subject-matter alleged in the complaint in so far as it related to any cause of action in her favor. The amended answer admitted the accident, and that the death occurred as a direct and proximate result of the negligence of the defendant. A judgment for $12,000 was returned in favor of plaintiffs and from that judgment this appeal is taken.

At about 3 o'clock in the morning of June 4, 1937, some miles north of Redding a stage owned and operated by the Pacific Greyhound Lines, carrying a driver and seven passengers, was wrecked and destroyed by fire. All of the passengers and the driver were killed. Plaintiffs claimed the body of one of the passengers as that of their son. The body was burned beyond recognition and identity was attempted to be established by a piece of suit material found on the body, and by the further fact that Carl James House left Chicago at 12:15 A. M. on the morning of June 1, 1937, on the bus of a connecting system, with a through ticket to Klamath Falls, Oregon, where he intended to meet his father, one of the plaintiffs herein. He checked his suitcase at Chicago to Klamath Falls, where it arrived a few days after the accident. The boy has never been heard of since the accident.

In this suitcase was found a vest of the same peculiar texture, material and color as that of the small piece of cloth taken from the body removed from the stage. ■ Error is claimed in permitting the mortician to compare this small piece of unburned cloth taken from the body of the victim with the vest found in the suitcase. The witness admitted he had no special knowledge as to fabrics, but all the witness did was to visually compare the two exhibits. No error was committed thereby. The witness was testifying as to appearance only in a matter which the jury could have done for themselves, but it was not error for the witness to testify that the piece of unburned cloth resembled in appearance that of

the vest. ▮▮ Postcards were also introduced, written to friends of the boy, one postmarked Ogden 11:30 P. M., June 2, 1937, and another from Sacramento, marked 9:30 P. M., June 3, 1937. An official of the Greyhound Lines testified that the bus leaving Chicago at 12:15 A. M. June 1st, would arrive in Salt Lake City 9:35 P. M. June 2d and arrive in Sacramento at 6 P. M. June 3d, leaving the same day at 9:10 P. M. and would arrive at Redding at 1:55 A. M. June 4th. The stage in question was wrecked and burned shortly after that hour a few miles north of Redding.

George W. Young, Jr., with whom Carl James House was visiting in Chicago, testified he and other members of his family tried to induce young House to stay with them longer, but he then stated he was anxious to get home to Klamath Falls. No members of the House family have seen or heard from their son since the accident and the last witness who testified he had seen him alive was his friend in Chicago on the morning of June 1st, as he boarded the bus for Klamath Falls. Appellant claims there is nothing to show that the Carl James House who was referred to by the Youngs in Chicago was the son of plaintiffs, but there is no question but that the young man Carl James House who left the home of his sister, Mrs. Frances Anderson, at Ocean Springs, Mississippi, with his schoolmate George W. Young, Jr., and his mother Mrs. Young, by automobile en route to Chicago was the son of plaintiffs. That fact is established by the sister. There is no doubt either but what this same boy purchased a through ticket in Chicago for Klamath Falls, Oregon, and boarded a bus at Chicago with this ticket on the early morning of June 1st. It is also in evidence that it was the expressed intention of this boy to go straight through to Klamath Falls. The time schedules of the bus and its connecting lines at Ogden and Sacramento coincide with the postmarks upon the cards written by the boy to friends from these points. The suitcase checked in Chicago through to Klamath Falls (and which an official of the stage line testified might be carried either on the same bus with the passenger or on a following conveyance) reached Klamath Falls after the accident and contained the clothing of the boy that had been placed therein by the sister. This sister described a suit belonging to the boy which she had packed in the suitcase that was similar to the vest found in the suitcase which

also corresponded to the small piece of cloth found unburned upon the body taken from the stage. The mortician from his examination of the body also testified it was that of a man between eighteen and twenty-five years of age, weighing approximately 150 pounds and probably five feet eight inches in height.

The foregoing facts and circumstances, together with the fact that the stage leaving Sacramento at about the time the postcard was mailed there by Carl House was the one involved in the accident and that no one has testified they have seen or heard of Carl James House in the year intervening between the accident and the trial of the action, are ample to justify the conclusion of the court and jury that the body taken from the wrecked stage was that of the son of plaintiffs and that he was killed in the accident in question.

Appellants contend that the verdict of the jury in the sum of $12,000 was excessive. The evidence shows that Carl James House was eighteen years of age and in good health. He was in his junior year in high school and was preparing either for a course in law or forestry in some advanced school of learning. As a boy of eight or ten he had sold newspapers, making from a dollar to a dollar and a half a day, which he gave to his mother. At one time, while living in Long Beach, he sold ice cream, the proceeds of which he also gave his mother to assist in the support of the family. While attending school in Mississippi he was employed from time to time as a caddy on the nearby golf course, when he could spare the time from his studies. At Klamath Falls he worked in the mills and also did the cooking and kept the cabin in order in which he, his father and a third man lived. At home with his mother he did the work that might be expected of a boy at home, bringing in the wood, assisting in the family washing, building a cow shed, etc. His habits were good, he was obedient, did not smoke or drink and was never in any trouble. He was studious and ambitious. His father's age was forty-nine, with an expectancy of some twenty-one years, and his mother's age was forty-seven. His father was a day laborer. The health of the mother was not good, she being unable on that account to live in Klamath Falls.

In view of the foregoing facts, we cannot say that the jury was animated by passion or prejudice in arriving at the

amount of the verdict. As said in *Dickinson* v. *Southern Pac. Co.,* 172 Cal. 727 [158 Pac. 183]:

"It is not possible to measure in exact terms of money the loss which a surviving husband, wife, or child may have sustained through being deprived of the comfort and society of the deceased spouse or parent. For this reason, some play is allowed to the discretion of the jury by the provision of section 377 (Code Civ. Proc.) that such damages may be allowed as under all the circumstances of the case may be just."

The reasoning in *O'Meara* v. *Haiden,* 204 Cal. 354 [268 Pac. 334, 60 A. L. R. 1381], where a verdict of $10,250 was upheld for the death of a seven year old boy is here in point, where appellant claimed the verdict was excessive and directed attention to certain early cases. Mr. Justice Curtis, speaking for the court in the O'Meara case, in considering an earlier case where a judgment in favor of a parent for the death of a six and a half year old boy was reversed solely upon the ground that the amount was excessive said:

"Under the present conditions that case [*Wiezorek* v. *Ferris,* 176 Cal. 353 [167 Pac. 234] cannot be accepted as a final authority in determining whether the verdict in the present action is excessive or not. On the other hand, the present verdict must be considered under the conditions prevailing at the present time, or at least at the time it was rendered in January, 1925. We must, as courts in other jurisdictions have done in passing upon similar questions as that involved herein, take judicial notice of the fact that the value of the dollar has materially changed from what it was some 10 to 15 years ago. Whether it is 'cut in half' as intimated by the excerpt from one of the above-mentioned authorities, or not, it is universally admitted that it has materially decreased in value from what it was a few years ago. There has been a corresponding increase in wages and salaries as well as in the cost of living in all walks of life. The sum of $10,000 when measured by its present purchasing power is far less than what it formally was. A verdict, therefore, in this amount for personal injuries may well be sustained by the courts of to-day, when formerly it would have been their duty to set it aside as excessive. Before the advent of the present-day conditions verdicts for the death of a child

amounting to $5,000 or more were frequently rendered by juries, and sustained by the courts.''

This record does not disclose that the amount of the verdict is so grossly disproportionate to any reasonable compensation as to even suggest that it was based on passion or prejudice.

█ Misconduct is charged against counsel for the plaintiffs in that he charged attorneys for defendant with suppressing certain evidence. A former employee of defendant was subpoenaed by plaintiffs in Redding at the time he was then attending as a witness in another action. The former employee, a resident of Modesto, which is more than one hundred miles from the place of trial, failed to appear on the day of the trial, having refused, apparently under section 1989 of the Code of Civil Procedure, to attend as a witness. It was intimated rather strongly by the attorney for plaintiffs that defendant was instrumental in advising the witness as to his rights in refusing to obey the subpoena. While it is true the charges of counsel against defendant were improper and uncalled for, it cannot be said that such remarks were so erroneous as to call for a reversal, particularly in view of the admonition of the trial court, following the colloquy of counsel.

█ Misconduct was also charged in injecting the issue of poverty of plaintiffs into the case. Some of such evidence was brought out, however, on cross-examination by defendant. Plaintiffs, however, did by an offer of proof, set forth the financial standing of plaintiffs, but this offer was refused by the court and was followed by a proper curative admonition to the jury. We can perceive no error of sufficient gravity to justify a reversal upon this ground.

█ Objection was also made to the fact plaintiffs insisted upon introducing evidence at the trial of the negligence of defendant after such negligence had been admitted by defendant in an amended answer. The original answer denied any negligence, but on the morning of the trial and after the jury had been impaneled an amended answer was filed wherein defendant admitted negligence. In *Martin* v. *Pacific Gas & Elec. Co.*, 203 Cal. 291 [264 Pac. 246], the defendant there attempted by an admission to limit the issues to the question of the amount of the damages to be awarded. The court there said: ''Indeed it never has been the law

that it was or could be error to prove even admitted allegations of the pleadings if the patience of the trial court would permit it." To the same effect is *Rowe* v. *Rennick*, 112 Cal. App. 576 [297 Pac. 603].

The most serious objection urged by defendant is that the mother was an improper party plaintiff. Section 376 of the Code of Civil Procedure provides:

"A father, or in case of his death or desertion of his family, the mother, may maintain an action for the injury or death of a minor child, . . . "

In the instant case the action was brought by John V. House and Samie G. House, his wife, as plaintiffs, and the verdict found in favor of plaintiffs and the judgment based thereon ordered "that the plaintiffs, John V. House and Samie G. House, have and recover of and from the defendant, Pacific Greyhound Lines, a corporation, the sum of twelve thousand dollars". The presence of the wife as joint plaintiff would at most constitute a misjoinder and as all of the facts appeared upon the face of the complaint, objection should have been taken by special demurrer. No such demurrer was filed. In the original answer no objection was made to the presence of the wife as a party plaintiff. In the amended answer a special cause of action was set up alleging that the court had no jurisdiction of the subject-matter of the action in so far as it related to an alleged cause of action in favor of plaintiff, Samie G. House. Legal incapacity of the plaintiff to sue would not go to the jurisdiction of the court. (*Rosenbloom* v. *Southern Pac. Co.*, 59 Cal. App. 102 [210 Pac. 53] ; *Crittenden* v. *Superior Court*, 166 Cal. 340 [136 Pac. 287] ; *Work* v. *Campbell*, 164 Cal. 343 [43 L. R. A. (N. S.) 581, 128 Pac. 943].) So it would appear defendant had failed to raise the objection, if any, either by demurrer or answer and not having been so raised it must be deemed waived. (*Rosenbloom* v. *Southern Pac. Co.*, *supra*; sec. 434, Code Civ. Proc.) But assuming, however, that that issue was properly presented, we still believe that defendant is not entitled to a reversal. The purpose of section 376 of the Code of Civil Procedure was to designate the necessary party plaintiff in order that a defendant might be protected against multiplicity of actions and that a finality of the litigation might be assured. Here the father was a necessary party

and as such he was made plaintiff. Section 378 of the Code of Civil Procedure provides that:

"All persons may be joined in one action as plaintiffs who have an interest in the subject of the action or in whom any right to relief in respect to or arising out of the same transaction or series of transactions is alleged to exist. . . . "

Section 376 of the Code of Civil Procedure would not in effect eliminate the joining a proper party with the necessary party to the action. In *Espinosa* v. *Haslam,* 8 Cal. App. (2d) 213 [47 Pac. (2d) 479], a situation arose that might have been prevented if the procedure here followed were there adopted. There it became necessary for the court to determine as a matter of fact whether the father, although divorced from the wife, had at the time of the accident to a son, actually deserted his family, and whether the father or the mother was the necessary party plaintiff. Furthermore, where a clear right of action is stated in the father as plaintiff, a judgment should not be reversed even though proper objections were made, the remedy being dismissal as to the unnecessary party. (*Gillespie* v. *Gouly,* 152 Cal. 643 [93 Pac. 856].) In *Abos* v. *Martyn,* 10 Cal. App. (2d) 698 [52 Pac. (2d) 987], a wife was made a party plaintiff for the reason the proceeds of the judgment would become community property, and the mother, having an interest therein, was properly joined as plaintiff. If it is necessary to examine the laws of the foreign jurisdiction to determine the right of a necessary party plaintiff to an action filed in California for an injury inflicted in California, we find justification in the laws of Oregon for her being joined as party plaintiff. In section 33–304, Oregon Code, it is provided that equal rights and responsibilities are given both parents, not only in the custody and earnings of the children, but also as to inheritance from an unmarried minor, and an equal right of support. (Oregon Code, sec. 27–1402.)

It would therefore appear from an examination of the entire record that there has been no miscarriage of justice in this case and we are impelled thereby to an affirmance of the judgment. It is so ordered.

Tuttle, J., and Thompson, J., concurred.